**Bruce BROWDER, Appellant,**

v.

**The STATE of Texas.**

**Nos. 1748–01, 1749–01.**

Court of Criminal Appeals of Texas.

July 2, 2003.

---

2. *Id.,* ops. at 471–72.

Jim Minter, Fort Worth, for Appellant.

Tanya S. Dohoney, Asst. State Atty., Fort Worth, Matthew Paul, State's Atty., Austin, for State.

*OPINION*

HERVEY, J., delivered the opinion of the Court in which KELLER, PJ., WOMACK, KEASLER, HOLCOMB and COCHRAN, JJ., joined.

In this case, the State sought to revoke appellant's probation on two charges of sexual abuse of a child. Appellant raised a "due diligence" claim in the trial court. The trial court made findings adverse to this claim and revoked appellant's probation. The Court of Appeals decided that the record did not support the trial court's findings on appellant's "due diligence" claim and reversed the trial court's ruling revoking appellant's probation. We decide that the Court of Appeals erred in not viewing the evidence in the light most favorable to the trial court's findings on appellant's "due diligence" claim.

In January 1982, the trial court placed appellant on 10 years probation in Tarrant County on two charges of sexual abuse of a child. In December 1988, the State filed a motion to revoke appellant's probation, and the trial court issued two warrants for appellant's arrest. Appellant was arrested on these warrants in Montgomery County in September 1999, over seven years after his probation had expired.

Appellant claimed at the revocation hearing that he was entitled to a dismissal of the State's motion to revoke his probation because the State failed to use due diligence in arresting him on the 1988 arrest warrants. *See generally Peacock v. State*, 77 S.W.3d 285, 287–88 (Tex.Cr.App. 2002) (requiring the State in cases like this to prove that it used due diligence in arresting the probationer). The State's evidence showed that appellant stopped reporting regularly to his probation officer after June 1988, at which time appellant was in violation of several conditions of his probation.[1]

In August 1988, appellant telephoned his probation officer and told her that he was living at 1216 McHam in Irving, Texas, in Dallas County.[2] This is the same address as his brother-in-law. Between August and December 1988, Tarrant County authorities tried to contact appellant by telephone but were unsuccessful. Tarrant County authorities were also unable to locate appellant at two places where he had indicated that he was employed.

The December 1988 warrants for appellant's arrest listed the brother-in-law's 1216 McHam address in Irving as appellant's last known address. Dallas County authorities unsuccessfully attempted to arrest appellant there at least twice in December 1988. A letter sent to appellant at that address on October 19, 1988, was returned to the probation department.

---

1. The motion to revoke alleged that appellant failed to report in June 1982, September 1984, September 1986, February 1987, as well as February, March, May, June, July, August and September 1988.

2. Although the record does not clearly indicate appellant's address when he was originally placed on probation, testimony indicates that his address in June 1988 was 600 E. Denton Drive in Euless, Texas.

Another letter sent to the Euless, Texas, address on October 7, 1988, was also returned to the probation department.

The State presented evidence that between December 1988 and September 1999 appellant changed his name, changed his address several times, changed his employment, kept utility bills in his wife's name and did not renew his expired driver's license. The State also presented evidence that Tarrant County authorities made other attempts to locate appellant in 1997, 1998 and 1999. *See Browder v. State,* slip op. at 5–8 (Tex.App.-Fort Worth, June 28, 2001) (nonpublished). For example, a Tarrant County Sheriff's Office investigator testified about her 1997 efforts to locate appellant.

Q. Did you have any luck under the name of Bruce Browder in finding this particular Bruce Browder?

A. No, sir.

Q. But did you eventually have luck *under another name?*

A. The paperwork on Browder we [sic] kept coming up empty. We would find the residence where his sisters lived and phone numbers, and phone calls was [sic] placed to try to see if they knew where he was, and they had no knowledge of where he was.

Q. What else?

A. I checked the driver's license. Every six months I would pull—this is on what we call ZZ99 list.

Q. 99 meaning the year?

A. No, 99 means they have been worked, they cannot be found.

Q. Okay.

A. Every six months I would pull these out and go back and run the driver's license, run the Social, see if there is any change, see if they have had any renewal. On this one we couldn't get a driver's license, so there wasn't any driver's

license renewal. The Social Security number did not come back that Bruce Browder was working anywhere.

Q. Did it come back to another name?

A. Yes, it did.

Q. What it did [sic] come back to?

A. I don't recall in the beginning the name that it come back to.

Q. Do you recall now what it came back to?

A. Yes.

Q. And what did it come back to?

A. Bridges.

Q. Did you learn that name was changed from Browder to Bridges?

A. Yes, sir. We tried all the avenues that we could find. Over and over again I pulled and worked it. My partner pulled and worked it. Sergeant Trubey, who was the sergeant in our task force that I've been changed over to now, which is special operation, he pulled it and made more contact with the sisters and stuff. We couldn't locate anything on it. I run the driver's license again, and they come back issued to a Sanchez.

Q. In other words, the driver's license that was under Bruce Browder has now expired and the number has been reissued to someone else?

A. Yes. As best as I can tell, since '96, Sanchez has had the driver's license number that did belong to Bruce.

Q. Did you go to a Probation Department file or someplace to look for any more information to determine how the name was changed or anything like that?

A. When we kept coming up completely cold on everything, we thought, well, okay, let's start all over again, let's go to Probation and see what they have because sometimes in notes, in their paperwork, they will have something that we

don't have access to, information, you know, from other departments.

Q. What did you learn?

A: We found out—we started just flipping through it, and the file is about this thick, and we started going through each page, trying to find something that would help us get another lead, something to go on.

And we came down to one sheet that the probation officer had had a call from Mr. Browder's third ex-wife, and she was upset, she was trying to find him for back child support, and this was in 1990. The note on there said that she knew for a fact that he had changed his name and he was going under the name of Bridges.

Appellant's brother-in-law testified that in December 1988 appellant was living with him at the 1216 McHam address listed in the arrest warrants. Appellant's brother-in-law also testified that no one came to this address to arrest appellant in December 1988. The brother-in-law testified that he kept in regular contact with appellant.

Appellant testified that in December 1988 he was living at his mother's house "as well" as at the 1216 McHam address listed in the arrest warrants.

Q. Between 1988, the last reporting date, and 1996, when you moved to The Woodlands, tell the Court the addresses you lived at?

A. I lived at my mom's house, 108 Kiowa Drive in Arlington, Texas. I also lived in my brother-in-law's house (at the address listed in the warrants) there in Irving, Texas, as well. In 1990, I married a woman that I've been currently married to. We lived in Tarrant County right at the corner of 183 and 360. I don't have the address off the top of my head, but I can get it for you. And we moved across the street to a different apartment. And then we lived in Joshua, Texas, which is right outside Burleson, for two and a half years after that. And then from there we moved to The Woodlands, Texas, where we lived for, I guess, about two and a half years. And then we purchased a home in Conroe where we presently reside.

Appellant's mother testified that appellant lived with her "back in '81, '82, maybe '85." She also testified that the police never came there looking for appellant although she stated "one man came by at one time." Other evidence was presented that the police knew where appellant's mother lived and that her address was listed in an information sheet[3] that appellant filled out at the time he was placed on probation in 1982. The probation officer who testified could not state whether or not anyone attempted to locate appellant at the mother's address.

Appellant further testified that he believed that he did not have to continue reporting to his probation officer when he quit reporting after June 1988 because his probation officer told him that he could "get off of it" after serving two thirds of it. On cross-examination, appellant testified that his probation officer never told him that he could stop reporting.

Q. Okay. Did [appellant's probation officer] tell you after you reported in June '88, that, "Hey, you don't have to report anymore, you are done"?

A. No, sir, they didn't say that.

On cross-examination, the Court also asked appellant some questions concerning why appellant did not "have a driver's license for over 10 years."

---

**3.** This information sheet is not in the appel-  late record.

[THE COURT]: Excuse me just a minute.

Were you without a driver's license from 1987 until three or four months ago? It's not a hard one.

A. No.

[THE COURT]: What license did you have?

A. No, I was without a driver's license.

[THE COURT]: Do you use a car in your work?

A. Sometimes I do, yes, sir.

[THE COURT]: And you went over ten years without having any kind of driver's license?

A. Yes, sir.

[THE COURT]: Why would you do that?

A. Well, never had a speeding ticket— I mean, I haven't had a speeding ticket in a long time, and I don't know.

[THE COURT]: Are you sure that's what you want to tell me, because you never got a speeding ticket, you didn't have a driver's license for over 10 years?

A. Well, I just—I didn't renew my driver's license. I didn't know the thing was up. I mean, I guess it was up in 1987. I mean, my name had changed.

[THE COURT]: For 10 years?

A. Yes, sir.

Following the revocation hearing, the trial court made the following findings and revoked appellant's probation.

I find that the authorities of Tarrant County made routine, but substantial gestures toward finding [appellant] in the early days of probation, that they wouldn't be able to find him because he gave false addresses, he changed his name, he left, moved away from the jurisdiction of the Court, he deceptively used other names to pay his light bill, phone bill, even his home in another.

Further, he refused to renew his driver's license in 1987 because it had become popular at that time for certain warrants to be served when you went to renew your driver's license, and he's been hiding out until his arrest.

Now, unfortunately, [appellant] probably has done a great deal of rehabilitation. He may have been a better citizen because he has been hiding out, and has no subsequent offenses for that to his credit, but we can't let it go by.

The Court of Appeals decided that the State's motion to revoke appellant's probation had to be dismissed because the record did not "support many of the trial court's findings." *See Browder*, slip op. at 11. The Court of Appeals stated:

The record before us does not support many of the trial court's findings. Appellant testified that, after he stopped reporting to his probation officer in 1988, he lived with his mother for a time and with his brother-in-law. Although the Tarrant County probation department had both addresses in its files, there is no evidence that authorities attempted to contact Appellant's mother, and there is no evidence that anyone contacted Appellant's sister until Wonzer began working the case in 1997. Additionally, Appellant testified that his house was in his name as well as his wife's name.[4] This testimony was undisputed. Moreover, although appellant testified that the utilities were in his wife's name because "[s]he usually handles all the bills," McNeal testified that he had been informed by the electric

---

**4.** The record reflects that appellant had changed his name when he and his wife bought the house.

company in Montgomery County that Appellant's name was listed on the account.[5] There is no evidence to support the assertion that Appellant gave false addresses and changed his name in an effort to elude authorities. By at least 1990, the Tarrant County Probation Department was aware of the fact that Appellant might be using the name Bridges. Additionally, the name change was a matter of public record, located by McNeal in 1999. We note that McNeal, who first began to search for Appellant in July, 1999, was able to discover Appellant's name change, locate him in Montgomery County, and secure his arrest there in a matter of approximately three months.

After carefully reviewing the record before us, we cannot say that the State discharged its burden of showing that its actions in seeking Appellant pursuant to the warrants issued for his arrest satisfied the requirement of due diligence. Tarrant County authorities did nothing, other than send the warrants to Dallas County, from 1988 until 1997. There is no explanation in the record for this extended period of inaction. Furthermore, there is no evidence that Dallas County authorities did anything to apprehend Appellant after December 1988, and it is unclear, for that matter, what exactly those authorities did to locate Appellant in 1988.

*Id.*

We exercised our discretionary authority to review the decision of the Court of Appeals on two grounds which in relevant part state:

> The Second Court of Appeals erred when it applied a de novo standard of review and rejected the trial court's fact findings even though the findings were premised on matters deserving deference which were supported by the record.

> The Second Court of Appeals erred when it held that the trial court should have dismissed the State's revocation petition for a lack of due diligence on the part of the State in executing the arrest warrants.

Our decision in *Peacock* held that the State failed to use due diligence in arresting the probationer. *Peacock* and the cases upon which it relied rested primarily on the rationale that law enforcement authorities made no attempt to locate the probationers where they informed law enforcement authorities they could be located. *See Peacock,* 77 S.W.3d at 287–88 (law enforcement authorities made no attempt to locate probationer through his mother whom appellant had informed probation authorities "could be used as a contact person").[6] In this case, however, the evi-

---

5.  McNeal actually testified:
    Q. And what did you do after you learned that?
    A. We started looking in to see if the same person that was on the ROCIC was the same person that we were looking for, which I got hold of the electrical company down in Conroe.
    Q. What did you find out there?
    A. Lady there told me that there was two people on the account, a Lori Bridges and Mr. Browder, but she was telling me that Browder and Bridges started to merge their electrical service there, and—but she could not identify Bridges because of the lack of information on that account. Everything was done in Lori Bridges' name.

6.  *Citing Harris v. State,* 843 S.W.2d 34, 35–36 (Tex.Cr.App.1992) (law enforcement knew probationer's address and contact person); *Rodriguez v. State,* 804 S.W.2d 516, 518 (Tex. Cr.App.1991) (law enforcement knew probationer's address and place of employment); *Langston v. State,* 800 S.W.2d 553, 555 (Tex. Cr.App.1990) (law enforcement knew probationer's address).

dence supports findings that, in October and December 1988, law enforcement authorities diligently attempted to locate appellant at two separate addresses where appellant had told probation authorities he would be. Having observed the demeanor of the testifying witnesses, the trial court was in the best position to resolve any conflicts in the testimony. *See generally Guzman v. State*, 955 S.W.2d 85, 87–90 (Tex.Cr.App.1997). In deciding that the record did not "support many of the trial court's findings," the Court of Appeals failed to view the evidence in the light most favorable to these findings as required by *Guzman.*

In addition, specific provisions of appellant's conditions of probation included:

g. Remain within the limits of Tarrant County, Texas, unless given permission by the Tarrant County Probation Office to leave therefrom;

\* \* \* \* \* \*

i. Notify the Adult Probation Officer of Tarrant County, Texas, if your address or employment is changed within five days from the date of change;

Law enforcement authorities cannot easily locate probationers if they are not informed of their whereabouts. By appellant's own admission he remarried in 1990, after which he moved five times, changed his name, changed his employment and declined to renew his driver's license. Despite these efforts to hide, law enforcement officials found him anyway.

The Court of Appeals wrongly focused on what it perceived to be inaction or lack of due diligence on the part of law enforcement while ignoring appellant's responsibility to keep authorities informed of his whereabouts and de-emphasizing his efforts to abscond. *Peacock's* statement that a probationer has no duty to walk "through the front door" does not mean that a probationer has no duty to keep probation officials informed of his current physical address and whereabouts. *See Peacock,* 77 S.W.3d at 288.

The judgment of the Court of Appeals is reversed and the judgment of the trial court is affirmed.

MEYERS, J., filed a concurring opinion, in which PRICE and JOHNSON, JJ., joined.

MEYERS, J., filed a concurring opinion, joined by PRICE and JOHNSON, JJ.

The majority holds that the Court of Appeals erred by failing to view the evidence in the light most favorable to the trial court findings, under *Guzman.* I write separately simply to point out that the standard of appellate review of trial court findings in the due diligence context is not governed by the "almost total deference" standard invoked by the majority.

The defense of lack of due diligence in apprehending a probationer must be raised by the appellant before or during the revocation hearing. *Hardman v. State,* 614 S.W.2d 123, 127 (Tex.Crim.App. 1981). Once the defendant raises the issue, the burden shifts to the State to show that due diligence was used in apprehending the defendant. *Langston v. State,* 800 S.W.2d 553, 555 (Tex.Crim.App.1990). Thus, lack of due diligence is not an affirmative defense, and the State bears the ultimate burden of persuasion. *Rodriguez v. State,* 804 S.W.2d 516, 519 (Tex.Crim. App.1991).

When, as here, a defendant challenges the factual sufficiency of the rejection of a defense, we have held that "the reviewing court reviews all of the evidence in a neutral light and asks whether the State's evidence taken alone is too weak to support the finding and whether the proof of guilt, although adequate if taken alone, is

against the great weight and preponderance of the evidence." *Zuliani v. State,* 97 S.W.3d 589, 595 (Tex.Crim.App.2003). The *Guzman* requirement of viewing the evidence in the light most favorable to the trial court's holding is inapplicable here.

The Court of Appeals in this case properly reviewed the findings of the trial court in a neutral light, and determined that the State had failed to meet its burden of showing, by a preponderance of evidence, that it acted with due diligence. The majority reverses the Court of Appeals' judgment, holding that the Court of Appeals erroneously applied a de novo standard of review. I write separately because I believe that the Court of Appeals applied the correct standard of review, but reached the wrong result.

A brief survey of the Texas courts' decisions on this issue shows that in most of the cases in which lack of due diligence was found, the State made little or no effort to locate a missing probationer. *Compare, Peacock v. State,* 77 S.W.3d 285 (Tex.Crim.App.2002)(only attempt to locate missing probationer was letter sent to post office box, although State possessed other contact information); *Rodriguez v. State,* 804 S.W.2d 516 (Tex.Crim.App.1991)(no efforts made by probation office to contact appellant, even though they knew his address and workplace) *with Strickland v. State,* 523 S.W.2d 250 (Tex.Crim.App.1975)(delay of eight months in arresting probationer who failed to report change of address did not constitute lack of diligence); *Beaty v. State,* 49 S.W.3d 606 (Tex.App.-Beaumont 2001)(State met burden of showing due diligence where sheriff entered warrant in police database, visited relatives of probationer, and ran driver's license checks periodically).

Once appellant properly raised the issue of lack of due diligence, the burden shifted to the State to show, by a preponderance of evidence, that it made a diligent effort to apprehend him. The State presented a significant amount of testimony regarding efforts to locate appellant, who had remarried, changed his name, had moved several times, and had not renewed his driver's license for ten years. While appellant proffered explanations for many of these actions, the trial court was within its discretion, after hearing and considering all the evidence, in finding that appellant's actions foiled the State's diligent efforts to apprehend him. Viewing the evidence in a neutral light, I would still reach the conclusion that the State met its burden of showing due diligence. Therefore, I concur in the judgment of the Court.